J-S29016-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.T., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.T., FATHER | : | No. 681 MDA 2023 |

Appeal from the Order Entered April 6, 2023
In the Court of Common Pleas of York County
Juvenile Division at No(s): CP-67-DP-0000108-2022

BEFORE: MURRAY, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY KING, J.:  **FILED: OCTOBER 16, 2023**

Appellant, C.T. ("Father"), appeals from the order entered in the York County Court of Common Pleas, which changed the permanency goal for L.T. ("Child") from reunification to adoption, following the motion of the York County Office of Children, Youth and Families ("CYF") for a combined placement review and dispositional review hearing. We affirm.

The relevant facts and procedural history of this appeal are as follow. On March 17, 2022, six-week-old Child was admitted to the emergency room at Hershey Medical Center, where doctors discovered "a broken femur and rib fractures on both the right and left sides that were in various stages of healing." (Dependency Petition, filed 5/17/22, at 2). M.H. ("Mother") and Father reported that they were the only caregivers for Child since his birth,

_____

[*] Retired Senior Judge assigned to the Superior Court.

they denied dropping Child, and they could not explain how Child sustained the injuries. The responding caseworker noted, however, that Mother "was holding the child in an odd, non-comforting manner, *i.e.,* away from her body with both hands out in front of her." (***Id.*** at 3). CYF subsequently received a child protective services referral alleging physical abuse.

In April 2022, "police obtained a copy of an incident report involving physical abuse of Father's other child [from a different mother] by Father," although no criminal charges were filed in that case. (***Id.***) On April 27, 2022, in an interview with police and a CYF caseworker, Father explained that he has "severe depression and anxiety with auditory hallucinations that recently progressed to include visual hallucinations." (***Id.***) Father admitted that on one occasion he "couldn't get out of his head," and he grabbed Child "in the rib area" and put him on his chest. (***Id.***) Father also indicated that he held Child like a "suitcase," grabbing Child by the arm and leg such that "the other side of the body [was] kind of dangling." (N.T. Hearing, 6/1/22, at 52). Due to his hallucinations, Father could not recall how much force he used.

CYF filed an application for emergency protective custody on May 13, 2022, which the court granted that same day. On May 17, 2022, CYF filed a dependency petition. CYF subsequently filed a motion for finding of aggravated circumstances, arguing that Child suffered physical abuse resulting in serious bodily injury. The court adjudicated Child dependent on June 1, 2022. On October 20, 2022, the court found clear and convincing

- 2 -

evidence to establish that aggravated circumstances existed as to Mother and Father.

Thereafter, the court received a neuropsychological evaluation of Father from Dr. Amy M. Swope, Ph. D., a licensed psychologist and certified clinical neuropsychologist.[1]  In her report, Dr. Swope indicated that Father has a history of major depressive disorder, and he has experienced auditory and visual hallucination since the age of five.  (*See* CYF Exhibit 2, submitted 11/30/22, at 2).  Dr. Swope diagnosed Father with Post-Traumatic Stress Disorder.  Dr. Swope noted that Father has a history of angry outbursts.  Dr. Swope detailed Father's extensive history of trauma, including abuse he suffered as a child and several attempts at suicide.  (*Id.* at 3).

Dr. Swope concluded that while Father is intelligent and committed to regaining custody of Child, he struggles with his history of trauma. Additionally, Father has "a scant system of social supports, interpersonal dysfunction, a low frustration tolerance, poor coping skills, difficulty with anger management, poor decision-making, and a marked lack of insight and awareness." (*Id.* at 6).  Based on her observations, Dr. Swope recommended that Father undergo an autism evaluation, obtain a psychiatrist, and continue with counseling through Catholic Charities.

On April 4, 2023, CYF filed a motion for a combined placement review

---

[1] Dr. Swope conducted the evaluation on September 17, 2022, and the court received the report at a status review hearing on November 30, 2022.

and dispositional review hearing. The court conducted the hearing on April 6, 2023, and it summarized the witnesses' testimony as follows:

> Brittany Sunday testified that she is the family therapist working with Mother and Father in this case. The current goals for Mother were stabilization of mental health, increasing healthy coping skills for stress management with a focus on anxiety, improving self-esteem and productive communication skills. Mother's progress towards stabilizing her mental health was rated as moderate. The psychiatrist Mother saw diagnosed her with social anxiety disorder and adjustment disorder with mixed emotion disturbance. The psychiatrist recommended that Mother continue working with Catholic Charities, including her therapist through them, Leanne Meyers, and the psychiatrist prescribed Mother medication. The medication Mother was prescribed was fifty milligrams of Zoloft, which the psychiatrist, Dr. Heinly, hoped would help Mother feel less socially uncomfortable, which would enable her to be more appropriately assertive and confident in her presentation and manner. Mother's progress towards her other goals was also rated, by Ms. Sunday, as moderate.
>
> *    *    *
>
> Ms. Sunday reported working with Father for the same amount of time as she had worked with Mother and that, due to their schedules, she usually met with him in the community about every other week. Father's meetings with Ms. Sunday had actually decreased over time, which Ms. Sunday attributed to their schedules including her need to be in court at times. Approximately a month prior to the April 6, 2023, hearing, Father was contemplating discontinuing services and stopping visits due to it being hurtful for him to have to leave [Child] and just kind of thinking that he doesn't have a chance to have reunification with [Child]. Following talks with his counsel, Father continued to work towards goals to have visits with [Child].
>
> Ms. Sunday described Father as engaged during session, which caused Ms. Sunday to rate Father's progress towards his goals as moderate. Father's goals are the stabilization of his mental health and Father has a psychologist through

- 4 -

Wellspan Philhaven. Father's other goal is productive communications styles and Ms. Sunday stated that Father communicates appropriately with her. At the time of the April 6, 2023 hearing, Father was focused on his upcoming criminal court hearing.[2] Asked if she worked with Mother and Father in couple's counseling or co-parenting counseling, Ms. Sunday stated that these sessions were stopped in October of 2022 when the parents separated.

David Kasberg testified that he is a family advocate with Catholic Charities and that he had been working with Mother and Father. Mr. Kasberg usually met with Father twice per week. Mr. Kasberg engaged in coach parenting with Father and would also utilize the visits to catch up on developments in Father's personal or professional life. Mr. Kasberg testified that visits had improved since the prior court hearing. Mr. Kasberg confirmed Ms. Sunday's testimony that, in March, Father had attempted to discontinue visits before meeting with his counsel and then continuing the visits—the continuation of which Mr. Kasberg described as being accommodated. Mr. Kasberg had not observed any safety concerns during Father's visits with [Child].

Mr. Kasberg supervised Mother's visitation once per week and Ms. Sunday covered the other weekly visitations. These visitations occurred at Mother's residence and were fully supervised. Mr. Kasberg indicated that he provided coach parenting as needed because Mother had not needed much assistance over the course of the review period. Mr. Kasberg felt that Mother was fully prepared and generally parented from a nurturing and appropriate standpoint. Mr. Kasberg did not believe that Mother had missed any visits— at least during the review period. Mr. Kasberg opined that [Mother's] progress rated as moderate[;] however, Mr. Kasberg also stated that "I can't say mom has done very well with our agency's services, so I can't speak to that."

\* \* \*

---

[2] As discussed *infra*, the Commonwealth brought criminal charges against Father for causing Child's injuries.

[CYF] caseworker, Sarah White, testified that she had written a report to the court and that there were no updates in the interim. Ms. White testified that [CYF] recommended that [Child] be placed in the custody of [a maternal cousin], and that legal custody be retained through [CYF]. Ms. White testified that the [maternal cousin] only lived about ten to fifteen minutes from the, then, current resource family; though, the [maternal cousin lives] across the state line in Maryland. [CYF] continued to recommend that the goal be changed to adoption due to the updated protective capacity assessment that was completed by [Dr. Lisa Janetta].

(Trial Court Opinion, filed 6/6/23, at 3-12) (internal record citations and most quotation marks omitted). At the conclusion of the hearing, the court changed Child's permanency goal from reunification to adoption. On May 5, 2023, Father timely filed a notice of appeal and concise statement of errors.

Father now raises three issues for our review:

Whether the juvenile court erred as a matter of law and/or abused its discretion by changing the court ordered goal despite the testimony of regular and consistent progress made by the parents.

Whether the juvenile court erred as a matter of law and/or abused its discretion by changing the court ordered goal from reunification to adoption when the minor child has only been adjudicated for less than twelve (12) months at the time of the order.

Whether the juvenile court erred as a matter of law and/or abused its discretion when it changed the court ordered goal from reunification to adoption without clear and convincing evidence that a change of goal would serve the best interests of the child.

(Father's Brief at 4).

Father's issues are related, and we address them together. Father suggests that his "goal fairly early in the underlying dependency matter was

for Mother to be able to successfully reunify with the minor child." (*Id.* at 9). To the extent that the trial court focused on Father's desire to reunite with Child, Father states: "Just because Father believed that Mother should reunify did not mean that Father believed he needed any extensive form of custody." (*Id.*) Father emphasizes that Mother has made moderate progress towards all goals outlined in her family service plan, and she has substantially complied with all recommendations from CYF. Father contends that the service providers involved with this case have not asserted that Mother is incapable of parenting Child or that there were safety concerns during Mother or Father's visits with Child. Further, Father argues that there is a strong bond between Mother and Child, and Mother is much closer to reunification than where she was at the start of this case. Father concludes that the court abused its discretion when it changed the goal to adoption, and CFY did not produce clear and convincing evidence that a goal change is in Child's best interests. We disagree.

On appeal, goal change decisions are subject to an abuse of discretion standard of review. *In re N.C.*, 909 A.2d 818, 822 (Pa.Super. 2006).

> In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free

- 7 -

to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm, even if the record could also support an opposite result.

*Id.* at 822–23 (internal citations and quotation marks omitted).

The Juvenile Act controls the disposition of dependent children. ***In re R.P.***, 957 A.2d 1205, 1217 (Pa.Super. 2008). Section 6351 provides in relevant part:

**§ 6351.  Disposition of dependent child**

\*     \*     \*

**(f)     Matters to be determined at permanency hearing.**—At each permanency hearing, a court shall determine all of the following:

(1)   The continuing necessity for and appropriateness of the placement.

(2)   The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3)   The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4)   The appropriateness and feasibility of the current placement goal for the child.

(5)   The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6)   Whether the child is safe.

\*     \*     \*

(9)    If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i)    the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii)   the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii)  the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

\*    \*    \*

**(f.1)    Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1)    If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2)    If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3)    If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4)    If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

*    *    *

42 Pa.C.S.A. § 6351(f), (f.1).

"When the child welfare agency has made reasonable efforts to return a [dependent] child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home." **In re N.C., supra** at 823.

> [T]he fifteen-to-twenty-two-month timeframe set forth in the Juvenile Act is not prerequisite to a goal change, but rather is "an aspirational target in which to attain permanency." **In the Interest of L.T.**, 158 A.3d 1266, 1279 (Pa.Super. 2017) (citing 42 Pa.C.S.A. § 6351(f.1)(9)). While trial courts should not rush to change a child's permanency goal to adoption in circumstances where a parent is making progress toward reunification, neither should courts persist in attempting to reunite a family when further reunification efforts would be futile and/or contrary to a child's best interest.

**In re J.D.H.**, 171 A.3d 903, 909 (Pa.Super. 2017).

> Although the agency has the burden to show a goal change would serve the child's best interests, "[s]afety, permanency, and well-being of the child must take precedence over **all** other considerations" under Section

- 10 -

6351. ***In re D.P.***, 972 A.2d 1221, 1227 (Pa.Super. 2009), *appeal denied*, 601 Pa. 702, 973 A.2d 1007 (2009) (emphasis in original); ***In re S.B.***, … 943 A.2d 973, 978 [(Pa.Super. 2008)], *appeal denied*, 598 Pa. 782, 959 A.2d 320 (2008). "[T]he parent's rights are secondary" in a goal change proceeding. ***In re D.P., supra***.

Because the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies with a reunification plan. ***In re N.C., supra*** at 826-27. Where a parent's "skills, including [his] judgment with regard to the emotional well-being of [his] children, remain problematic[,]" a goal change to adoption might be appropriate, regardless of the parent's compliance with a permanency plan. ***Id.*** at 825. The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. … Thus, even where the parent makes earnest efforts, the "court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa.Super. 2006).

***In re R.M.G.***, 997 A.2d 339, 347 (Pa.Super. 2010), *appeal denied*, 608 Pa. 648, 12 A.3d 372 (2010).

Instantly, the trial court found that a goal change to adoption is appropriate:

We do not deny that Ms. Sunday and Mr. Kasberg testified that the parents had made "moderate" progress. However, … even substantial progress does not necessarily dictate reunification. Further, both Ms. Sunday and Mr. Kasberg admitted that they had not read the expert reports in this case.

First, ten (10) months into the subject dependency action, Father still had not progressed to unsupervised visitation, nor could any provider, expert or otherwise, provide a date by which such progression was or could be reasonably foreseeable. Quite on the contrary, all providers opined that Father's visitation would continue to need to be fully

supervised for the foreseeable future. Further, Dr. Swope's report is such that Father will be a risk of harm not only to [Child] but to himself for the foreseeable future.

Second, Father still faces pending criminal charges for: aggravated assault—victim less than 6 and defendant 18 or older (18 Pa.C.S.A. § 2702(a)(8)); endangering welfare of children—parent/guardian (18 Pa.C.S.A. § 4304(a)(1)); and simple assault (18 Pa.C.S.A. § 2701(a)(1)). ***Com. v. [C.T.]***, CP-67-CR-0005054-2022, which reflects a pretrial conference set for June 19, 2023.

Last, … time to permanency matters for children. And, although we begin with statements about the results of Mother's protective capacity report, also relevant to Father, we stated the following towards the conclusion of the April 6, 2023 hearing:

> Here's the thing, I've read [Mother's protective capacity assessment] too, okay? And, I mean, it— while it may not say that she cannot and never will [be able to parent], it talks about deep concerns, all right? And a bunch of things and recommendation. … And we are—I understand it might be ten months into this case, but frankly, you know, the child needs permanency. He is young, and the sooner that happens, the better.
>
> And, you know, the [parents'] original explanations for the extensive nature of these injuries have always fallen way short in the court's view. You know, we have—both parents have deep emotional and … traumas in their own past. I think Father a lot more than Mother. We've seen those reports, all right? And I just think the process of healing and recovery for both Mother and Father is going to be extensive.
>
> And [Child] has survived extensive trauma, this time. Father has a history of, quote unquote, blackout episodes, as a result of the extreme abuse that he apparently has sustained in his own life. And therefore, you know, is not in control of his own behavior and doesn't even know what he's doing, right? And then Mother has her own extensive trauma

history. And I have no idea when Mother—and I'm holding up the report on Mother's protective capacity, would ever be in a position to truly protect her son.

Without belaboring the point, despite the parents' "moderate progress," the parents' own uniquely troubled pasts and current and ongoing mental health struggles caused this court's overwhelming concern for their ability to make sound judgments regarding [Child]'s safety—even at their own hands.

Father's history of being unable to recall how much force he applied during, possibly (since Father cannot or will not recall), one of Father's periods of auditory hallucination presents too great a risk to [Child]'s safety when [Child] had multiple injuries in various states of healing during his, then, extremely short (6 week) lifespan. The court cannot adequately quantify the risk of a father who has, allegedly, already injured his son during mental breaks and then continues to succumb to periods of despondency vis-à-vis that child. Considering the foregoing history of this case, should Father experience a period of despondency while caring for [Child], who is still extremely young, the risk of a catastrophic outcome is, in this court's view, extremely high if not a certainty given Father's reported history of extreme emotional and physical abuse. In light of [Child]'s need for permanency, there is simply not enough time for Father to address the … threat he poses to [Child]. The simple fact is that Father's judgment regarding [Child]'s safety was too problematic for this court to avoid its duty to change the goal in order to protect [Child] and to provide him with the permanency he needs now and not when Father achieves hypothetical progress in his decision-making prowess.

(Trial Court Opinion at 14-17) (emphasis and footnote omitted).

Our review of the record confirms that sufficient evidence supported the court's findings. *See In re N.C., supra*. The court considered Father's moderate progress in alleviating the circumstances that necessitated Child's placement, as well as the possibility that Mother might someday be able to

parent Child. Nevertheless, the testimony and various expert reports led the court to determine that prioritizing permanency in Child's life best served his interests. *See In re J.D.H., supra*; *In re R.M.G., supra*. We cannot say that the court abused its discretion by choosing not to subordinate Child's need for permanence and stability to Father's requests for additional time to modify his own behavior, or that of Mother. *See In re R.M.G., supra*; *In re N.C., supra*. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/16/2023